second case on the day calendar, Allen v. Barr. May it please the court, Tim Hoover for petitioner Roger Allen. Roger Allen is a United States citizen. On the undisputed and indisputable facts, applying clearly issued presidential decisions from this court, he's a citizen. Why? In 1975 and 1976, when his father obtained a New York, Kings County default divorce order and custody decree, neither his mother or Roger, who was eight or nine at the time, had ever been to New York. They lived in Guyana. Moreover, and this became clear in our motion exhibit E that the court accepted in our reply brief, his mother was never served in New York. She was served with processing Guyana. That means two things. One, even under the, I would say, despicable 1975 and 1976 custody standards that New York had, which is the whole reason the law changed in all 50 states, there was no subject matter jurisdiction. And even under those standards at the time, even under New York law and the CPLR, someone in a divorce action where there was going to be a custody decree had to be personally served in New York. As a result, at a minimum, though, wouldn't we have to send it back for a hearing? Because it's not undisputed. Obviously, we did get the additional submission, which is significant, saying that she was in Guyana. But the divorce decree says she was served in New York. So shouldn't there at least be some type of hearing to see which one is correct? Three reasons why the answer is no. First of all, preliminarily, the legal standard here under 1252b-5 is the same as under Civil Rule 56. Judge Cabranes, your 1995 decision, I believe it's Fletcher v. Atex, says, look, on a Rule 56 decision, it's not some speculative fact. There needs to be a genuine issue of material fact. Second, Your Honor, the only place that the divorce decree determination that she was served in New York could come from is the court file. That's Exhibit E, pages 8 and 9. The affidavit of service, excuse me, 8 and 10. The affidavit of service at 10, and then the application for the default judgment, strangely termed an affidavit of regularity by the father's attorney at 8. And those say that she was served in Guyana. So there's no dispute of material fact. There's no dispute of fact. Moreover, the IJ up the street here actually found at Administrative Record, page 50, that's docket 13-2 on this court's docket, that the mother and Roger were never in New York at all. So there's no issue of fact, let alone a genuine issue of material fact. It doesn't need to be transferred to the Eastern District at all. And so ultimately the sister was not to get the derivative citizenship, right? Sister was determined to be a U.S. citizen. And we put this in our brief because we think it's important context. The government says somehow, again, the burden at the IJ level or the agency level is preponderance of the evidence. But my opponent has said, look, he didn't meet his burden somehow. The government itself determined for 25 years, this is Motion Exhibit A and B that the court has before it, that the court accepted, that Roger was a U.S. citizen. And that includes the Department of Justice, the Immigration and Naturalization Service. The judge who sentenced him in the Eastern District of North Carolina even said it. And it wasn't just these random determinations of low-level persons. Back in the old INS days, the district adjudication officer was the person responsible at the local federal level for making these determinations. And so we think it's undisputed and there doesn't need to be a transfer. The bottom line is, against that set of facts, it's really an easy case. There's no disputed facts, and you apply the framework set out in Garcia that's informed him ago. Would a court, a New York court, because that's where Roger lived at the time. And by the way, one additional undisputed fact. There's no dispute, Garcia's different in ways that make this a stronger case. Garcia, there was a real issue about where he lived on the Upper West Side in 1996 when his father naturalized. Here there's no dispute, because when Roger comes to the U.S. from Guyana in 1983, he comes as a green card holder. The parents' custody agreement is presented to the embassy in Georgetown. They admit him with the understanding that he's going to go live at 785 Hopkinson in Brooklyn. And there's no doubt about that, the school records, the documents, and the admission information is in the record. So you apply Garcia, and the question is a simple one. In 1983, a New York court, which would have jurisdiction over custody, would that court under Garcia follow or find the 1976 order to be enforceable? There's no doubt, in our mind at least, even under the 1976 standards, for the reason I indicated, that it wouldn't. But under the UCCJA that went into effect in 1978, it certainly wouldn't be followed. And the only thing that anyone below said about why Garcia doesn't control is, well, in Garcia, and actually in Begaud, the UCCJA was in effect at both the time of the original custody order and then the time of potential derivation. That's a distinction without a difference. The UCCJA was such a watershed, important event. And if you look at old domestic relations law 75C, excuse me, 75B, the purpose of the statute, it says the things that we've been explaining in our brief. It was designed and passed by all 50 states to address a huge problem of parental kidnapping, child snatching, contradictory jurisdictional determinations. The state law was so chaotic that the full faith and credit clause didn't even apply to custody determinations back then. So to say that the New York legislature would pass and make effective the UCCJA, and specifically provide provisions at 75-D for when jurisdiction applies, 75M for when a state court, an order of this state or of another state would be followed, would not provide the standard for a prior custody order from years, if not decades earlier, makes no sense to us at all. Of course, in 75-Z, the legislature said this applies. This sets the standard for jurisdictional determinations. And finally, of course, the standard for derivative citizenship claims is the law at the time of derivation. So we think what ultimately might have been, when I got appointed over the summer, perhaps a close case or an interesting case has become a crystal clear case. There's no disputed facts whatsoever. And, you know, with all due respect to my opponent, who's done a fine job, if the court asks him what facts are in question, perhaps the only thing he could say, Judge, is, well, the order itself says she was served in New York. But Judge Cabran's opinion answers that in my book. The court's not required to speculate about her potentially being served in New York that wasn't put in the court file. And, of course, that makes no sense. I'm not sure Occam's razor is a legal principle, but I think it fits pretty well here. The most likely explanation for something is the one that makes the most sense. Roger is a U.S. citizen. Thank you. Mr. Stanton? May it please the court, there are many privileges that come with citizenship rights. Just to name a few. You can hold public office. You can vote. You can serve on jury duties. You get diplomatic protection from the U.S. government against foreign nations. For this reason, the government has a very, very strong interest in ensuring that people who claim they are citizens are, in fact, citizens. They fulfill the statutory requirements. And the case law has determined that all doubts, including the U.S. Supreme Court and many other circuits and Judge Bianco, if you mind, the Fisher opinion, all doubts regarding citizenship are resolved against the particular citizen and the government's favor. Petitioner says the facts in this case are undisputed. Prior to his reply brief, that was certainly true. But he says a number of times in his briefs that this isn't clear and that's not clear with respect to record. All those disputes have to be resolved in the government's favor. What do you think is disputed? Disputed? Well, like his reply brief, he said it wasn't clear whether or not the mom actually received the actual divorce complaint or if she received the summons. Well, I mean, if it's not clear, then the court has to assume that she didn't, in fact, get the divorce complaint from initiation of a divorce proceeding by her soon-to-be ex-husband. And so I'll address that. He also said the law was clear in 1976 that you needed not only subject matter jurisdiction but also personal jurisdiction over both parents. That's not what the academics said at the time the New York UCCJ was passed. On page 19 of our brief, we cite the editor's notes saying that child custody jurisdictions have historically been indeterminate. We also cited a law review article that says flat-out a New York court could exercise jurisdiction in the custody area where it had the power to decide a matrimonial action, i.e., if one of the parties was a resident of the state, irrespective of whether the child was physically present in the state. But that proposition in the RFP… Let me give you a couple cases. May v. May, an appellate division case, says if the defendant mother or the child was within jurisdiction or before the court, the New York court lacked jurisdiction. Bruno v. Baric adds to the issue of custody, we find that New York should not entertain jurisdiction under the circumstances of this case since the children are presently neither domiciliaries nor residents of New York. So there are New York cases that would suggest that she was in Guyana, that this decree was invalid, right? Even assuming she was in Guyana, I mean, like the May case you're talking about, I believe that was 1932. I'm blanking on that. Anyway, but the section that the law review article cited was former New York domestic relations law section 240, which indicated all you needed was jurisdiction over the subject matter of the divorce. And by the way, I assume the petitioner does not dispute that the New York court had jurisdiction over the divorce, because if it doesn't have jurisdiction over the divorce, then the parties where his parents were not divorced. If she didn't get served and she was in Guyana, you're saying that wouldn't be problematic? That would not be problematic. Even assuming that wasn't the law of New York, I mean, she could have waived jurisdiction, so there's no dispute she did not show up. Personal jurisdiction can't be waived. She wasn't served. How could she show up? She was served with a summons. There's no dispute about that. She knew this was going on. No dispute that she knew was going on? She was served with a summons to appear in New York. Let me ask you this. Why was the sister given derivative citizenship? If what you're arguing to this court isn't correct, there would be no basis for the sister to have gotten citizenship, right? I actually asked my director of the immigration DOJ what I should respond to, like, if I was asked that question. His response was to not dispute the citizenship of the sister. But that being said, you cannot get a citizenship by estoppel. He has to prove his own facts. And even assuming that the sister did get citizenship based on those facts, it probably was a mistake, but there's no appetite currently for the Department of Justice to challenge the sister's citizenship. The records initially said, I think, that he had citizenship, too, and then were deleted. That was a mistake, too? I'm sorry, which one? Correct me if I'm wrong, but the records also indicated that he had citizenship. People thought he was a citizenship. Various government officials thought, believed that he was a citizen. That was not correct, though. Why did they believe he was a citizen? Why did they believe he was a citizen? I mean, we don't know for sure. It's possible he just told them that he was a citizen. The way the rule of citizenship works, Your Honor, is automatic. It's automatic. But if you want actual proof that you are a United States citizen, you have to actually apply. Now, I think that's what happened here. So if you want something that says you're an actual citizen, you have to actually apply to USCIS, and they will confirm that you are, in fact, who you say you are. In this particular case, USCIS determined, no, it doesn't cut it. I mean, again, I'd like to go back to the question of personal jurisdiction over the mother. I mean, if she was served with this complaint in Guyana and did not show up, she waived personal jurisdiction. I mean, this panel has extensive trial experience, so, I mean, if you're presiding over a case and there's good subject matter jurisdiction, there's diversity, there's federal question, and the defendant or other party is elsewhere and does not appear for whatever reason, I mean, I don't think the court would dismiss the case for lack of personal jurisdiction. It would enter a judgment, and if the absent party wanted to challenge that judgment for lack of jurisdiction or whatever basis, they could do that in a post-trial motion. So back to what are the contested facts from your perspective, and what are the facts in the sister's case that were wrong? So there are the identical facts, so I assume you've gone through the sister's case and said, I have not, no, I've gone through the record right here. So in this case, what are the disputed facts because your colleague or your opposing counsel says, you don't need to send this back, there isn't anything to resolve, we have all the records, we've provided them to this court, and there isn't any disputed fact to resolve. Do you agree with that? I mean, I would agree that there are no, there may not be disputed facts, even assuming the facts are what he says are, he still does not attain citizenship. Because, again, I mean, going back to the issue of personal jurisdiction with respect to the mom, why would she contest jurisdiction? I mean, I'm not a family law expert, but my understanding is when parties divorce, they argue over money and custody. Now, she's in Guyana, far away from Queens County, New York. According to the divorce decree, she left him, the mother left the husband sometime in early 1973, so she presumably wants nothing to do with him. And I assume money is not an object. She's got the kids, she's getting kids, so there was no reason for her to contest jurisdiction. Which New York case would you cite for the proposition that if the child and the mother are outside of the jurisdiction, you can still enter a valid divorce decree? Which case would you cite for that? I mean, we've cited several cases with respect to the child being outside. I mean, the problem is, I went back to look, this type of factual situation doesn't appear all that often. You have no case, New York case you could cite where the mother was outside of the jurisdiction? Tell me. Which case outside, the mother was outside the jurisdiction? Outside the jurisdiction of the child, just the child? The child and the mother outside the jurisdiction. But both the child and the mother are outside. I do not have a case to accept. I got the academic commentary, though. I mean, page 19 of my brief. And also the fact, again, the fact that she waived jurisdiction. I mean, opposing counsel says, I mean, a petitioner says that there's no indication that she waived jurisdiction. Well, she didn't show up. She didn't show up, and in 1979, when they entered this agreement to transfer custody, which, by the way, was never ratified by a state court, there was nothing in there. She never objected to the Supreme Court's jurisdiction. And so, I mean, our position is that, I mean — If we disagree with you, if we think it's important whether or not she was in the jurisdiction or not, is it your position that you can prove that she was? You want to go back to the district court and prove that she was in New York at the time? Or you do not want to do that? I mean, we would probably — if this court were to transfer the matter to the district court for additional proceedings, this would probably be the same as this, that she actually waived jurisdiction. And so, therefore, if there is good subject matter jurisdiction — You don't want an evidence you're going to try to prove that she was here at the time. I mean, there's nothing in the record indicating she was in New York at the time. No, there is not. So, again, our position is, based on those facts, she still does not meet the requirements of derivative citizenship. And so, and again, you cannot get citizenship by estoppel or as a matter of equity. I mean, this Court has said that. The Supreme Court has said that. It's unfortunate, this case, that the sister may or may not have been, like, on identical facts, but the fact that she got it should not have a bearing on whether she actually fulfilled the requirements. So, yeah. Thank you very much. All right. My daily job is as a white-collar criminal defense lawyer, but I remember enough from law school that to waive personal jurisdiction, you have to appear and fail to raise it. We addressed this in our gray brief at page 9. There was absolutely no waiver whatsoever. The father is the one who moved to New York if there was any abandonment. And with regard to divorce jurisdiction, we addressed that in a footnote in our brief, our gray brief, page 6 footnote 4. CPLR 314 sub 1 provides in-rem jurisdiction where there's personal service outside of the jurisdiction to give in-rem jurisdiction over divorce only. So there's no debate about whether there was a basis for the divorce decree. With regard to the policy interests at issue, I'm glad my opponent mentioned that. It's exactly the opposite. The purpose of the derivation statute are to ensure that the child of the naturalizing parent's real interests are in the United States at the time, and that's absolutely the case. There's no issue about the divorce complaint, whether it wasn't served. Here it's about personal and subject matter jurisdiction. And, Judge, you're exactly right about the record, the deletions at Exhibit B to the motion, 731 and 732, and the proof in Exhibit A and B. That's a 25-year, quarter-century history of people, not him saying that I'm a U.S. citizen, various agencies of the U.S. government determining it. All of which would like to see him deported because it's coming up at events in which his deportability is something that they're inquiring about, correct? Absolutely, Judge. In determining in the face of that, and this is before he rehabilitated himself and completed supervised release successfully in Brooklyn, but deciding, and this is Motion Exhibit A, 36 through 37, you'll remember, you know, void USC. It's about 96-point font that he's a U.S. citizen. A district adjudication officer saying, I agree that he's a U.S. citizen, and it goes on and on and on. With regard to transfer, it would be to the Eastern District because that's his last residence. He's been detained in Alabama. Let me ask you about the labor issue because I think that's always the main issue. You're not contesting that she was served with the papers in Guyana. Is that disputed? I'm not contesting based on the court file. Your position is she cannot waive the jurisdiction simply by being served, that she has to personally appear and waive? Two responses. First, subject matter jurisdiction as to custody can never be waived. But secondly, yes, she doesn't waive by being served invalidly outside the country or the state and then not appearing. You said those cases are in your brief? They're in our gray brief, Judge, at page 9. Thank you. The federal government's had 36-and-a-half years to try to raise a material issue, a genuine material issue of fact, and as we heard from my opponent this morning, they have none, except that they determined for 25 years that Rogers is a citizen and that Nicole is a citizen. Thank you. We ask the court to so hold. Thank you. We'll reserve this. Thank you. We'll hear counsel in RASME versus EEOC, and U.S. Equal Employment Opportunity Commission versus Marriott International. Good morning. May it please the court, Stephen Bergstein for the plaintiff appellant. The district court improperly granted summary judgments. I will focus on the hostile work environment claim. The evidence shows that plaintiff's coworkers routinely harassed him on the basis of his national origin and religion and that defendants failed to properly investigate his complaints or to take them seriously, even though the plaintiff had repeatedly complained about his work environment. Let me start with the severe or pervasive element of the hostile work environment claim. Plaintiffs, in the form of his sworn testimony, his EEOC charge, his affidavit, we have a flurry of offensive comments based on plaintiff's religion, national origin. I'm not going to repeat them here, but it sounds severe to me that his coworkers were targeting him because he was a Coptic Christian from Egypt. The question is then whether the harassment was pervasive, and even the district court said that plaintiff's testimony suggests pervasive discrimination, which is obviously a finding, an inference that we endorse, although the district court moved away from that and said that he still can't win because there are, for other reasons, that it didn't alter the conditions of his workplace. That's not quite the analysis under Harris v. Forklift. I think the plaintiff's testimony that this went on and on and on, that's a quote, that a coworker would use various derogatory phrases over and over, this is the kind of pervasive harassment that violates Title VII. Plaintiff pointed out in his deposition at page 400, that's Joint Appendix 371, that after a certain meeting in which plaintiff had complained about his coworkers' improper financial shenanigans in the workplace, after that meeting, his coworker never called me by my name after that, and he used to refer to me by these offensive comments relating to his national origin. So I think we satisfy the standard for severe or pervasive. We also have to show that the hostile work environment is imputed to the employer, and a jury can find that it is. The plaintiff complained repeatedly to his employer about the hostile work environment. He states under oath, after he complained, the harassment continued. If anything, it escalated. That testimony alone suggests that management's response to the harassment was ineffective. This court said so in Whidbey v. Garzarelli. We also have plaintiff's sworn testimony in his EEOC charge that when he complained about the environment, Doherty, the HR representative, verbally abused me, threatened to terminate me under false pretenses. This sort of evidence is throughout the record. He complained to different managers. They either didn't get back to him, or one of them down in Baltimore, who was director of operations or investigations, said, look, that's not my concern. Take it up with somebody else. I did, and she didn't do anything. Well, that's not my concern. So this is precisely the sort of negligence that a plaintiff has to show in order to impute the hostile work environment to management. So for these reasons, What is the remedy you seek from us? The remedy is the case should go to trial on the hostile work environment and the retaliation claim. So isn't he contending that the adverse employment action is that he got discharged, but we have a fight with another employee? That's the retaliation, right. Superseding intervening cause? What about that? Well, five months after he last complained, he is terminated because of this altercation. So the five months is enough to make out the prima facie case. We have evidence that HR told the plaintiff that if you keep complaining, we'll fabricate charges against you and you'll be fired. That's evidence of discriminatory or retaliatory intent. That alone gets you a trial. You don't have to show pretext when you have direct evidence of retaliatory or discriminatory intent. This court said so in Henry v. Wyatt Pharmaceutical, but I think the main point on the retaliation, obviously this is independent of the hostile work environment, but on the retaliation is that the other co-worker got terminated as well. He also got reinstated for arbitration. But why doesn't that preclude you from having a trial on that? That means the co-worker can't sue for wrongful discharge. The plaintiff said he didn't do it, and he was innocent of fighting intentionally with his co-worker. The plaintiff's evidence that he didn't do it, he says, would have been recorded on tape. No one looked at the tape. The plaintiff swears that there was a camera in the hallway where this happened. No one looked at the camera. So when we consider the threat from Dougherty, that if you keep complaining about the hostile environment, we'll fabricate charges against you, and then he's terminated under conditions that plaintiffs said could have exonerated him, but nobody tried to corroborate his innocence, that's evidence of retaliation. Did that come from discovery? Did you explore whether or not there was a tape at one point or not? Sadly, I wasn't involved in discovery. But the plaintiff's testimony was that he was there for 25 years. You're ready for trial. I mean, there are no further pretrial proceedings arguably present.  Okay, thank you. Thank you. EOC has been given some time to say a few words. Maybe you could begin by telling us how this case initially was brought to your attention. The EEOC tries to look at all of the cases coming out of district courts involving statutes that we enforce, so that's how it came to our attention. The district court makes the... How frequently, I'm just curious, it's totally unusual, how frequently does the EEOC submit amicus briefs in civil cases? I don't have an answer. Any point of appeals? I don't have an answer for you, but certainly we appear here fairly frequently. I personally have appeared here fairly frequently. Go ahead. The district court made three primary errors in its hostile work environment analysis. First, the court refused to consider relevant evidence. It said that comments or conduct that was not expressly discriminatory was irrelevant to the hostile work environment analysis. However, what the court did not consider is that much of this conduct and many of these comments were by the very same individuals who also engaged in expressly discriminatory harassment. This court has said over and over, in Raniola, Alfano, Cater, Puccino, the fact that it was the same individuals who engage in conduct that is not expressly, facially discriminatory and also conduct that is, is circumstantial evidence that the entire course of conduct was discriminatory. The court also refused to consider comments that Razmi overheard because they were not directed at him and called them just general... My opponent here calls them just general anti-religion statements. In fact, these statements were not just general anti-religion statements. They were highly offensive statements such as the idea of God is garbage, priests are child molesters, priests are alcoholics, religion is for stupid people, Egyptians are inferior to Greeks. Even though these comments were not directed at Razmi, they are part of the totality of circumstances. They're relevant because he was aware of these comments. Indeed, he testified that Estrafio always made sure that he heard them. That was at JA 381. So even though these comments were not directed at him, the fact that he was aware of them matters. And this court has said that in Torres, Cruz, Whitby, Petrosino. Contrary to what the district court said, Estrafio also directly insulted Razmi based on his religion. He calls him a pretentious Christian. He calls him an effing Christian. The indirect comments that Razmi overheard could very well have amplified the effect of the direct comments that were made to him, as this court recognized in Cruz. The second primary error that the district court made is it said the conditions of employment were not altered, even though a jury could find pervasive discrimination in this case. The court acknowledged that this pervasive discrimination consisted of what it called offensive and degrading comments, not just childish name-calling, comments that were sufficiently offensive here to satisfy the objective test for altering the conditions of employment. So this is a de novo review. So this court can look at all that evidence, correct? Correct. And he's going up the food chain and making complaints about wage theft. Does he make these same complaints about this hostile working environment? It's intolerable. I can't stand it anymore. Yes, he does. And at what stage does he do that? Because I thought it was about wage theft, and one of the things that the judge below said that kind of raised my eyebrows was, well, I think that it's probably the wage theft that gave rise to all these negative comments because these people had worked together for years, and that seemed to be a little bit speculative, but why wouldn't she know that he had gone and complained about the racial and religious comments? Well, that was on the record, but interestingly, a hostile work environment does not have to be the sole motive for discrimination. As this court recognized in Rivera, by saying that the harassers were, in the court's opinion, motivated, quote, more by personal animus than by discrimination, the court is implicitly acknowledging that discrimination may have been one motive. The case for the jury here would be, even though this may have been prompted by the wage theft allegations, they were working fine together, he makes the wage theft allegations, they're mad at him for that, but then to retaliate against him for that, they start harassing him based upon his religion and his ethnicity. That's exactly right, that the fact that whatever triggered it, they harassed him in expressly discriminatory ways. They chose to harass him using these comments that referred to his national origin, that referred to his religion. They didn't have to do that. So where there are multiple motives for harassment, and there may have been here, it may have been the whistleblowing as well as his national origin and religion. Where there are multiple motives, it's just impossible to disentangle how much was causing a hostile work environment. That is an issue for the jury. Thank you. Thank you. Thank you, Ms. Coleman. Mr. Salomon? Thank you, Your Honors. Marriott respectfully submits Judge Nathan was correct in all respects when she dismissed Mr. Razmi's discrimination, retaliation, and hostile work environment claims. Because plaintiff does not appeal the dismissal of the discrimination claim and does not appeal the dismissal of the individual defendants, I'll briefly address the retaliation claim first. Judge Nathan, and forgive me, Your Honors, but I have been involved in the case since its inception, so I can point out as I go along where my opposing counsel has misstated parts of the record. Judge Nathan was right in dismissing the retaliation claim because he could not and he still cannot dispute that his employment, just like that of his coworker, Mr. Pompanga, was terminated due to their verbal and physical altercation at the Essex House Hotel. Marriott has a zero tolerance policy for workplace aggression and violence, which is perhaps the strongest legitimate non-discriminatory, non-retaliatory business reason for discharge in all of employment law. He made two points on that. The first point was that there was direct evidence of retaliation by the comment, keep your mouth shut about anything happening at the hotel. Those comments took place years prior. So the idea that Your Honor got it correct in terms of the intervening proximate cause, you're talking about more than a year and a half between his last complaint of the discriminatory comments in the summer of 2014. His theory is I did nothing wrong in this fight. It was all the other guy's fault. But because they were looking for a way to fire me for years, this gave them the opportunity to do it. They didn't investigate it. They just fired us both. He was responsible, so he deserved to be fired. I understand. So what's your response? Your Honor, the record is very clear that there was an investigation. Every witness that was interviewed that was available who saw the altercation was interviewed. Mr. Pampanga was interviewed, and he told his version of the story where he was pushed, shoved, took a swing at, spit in his face. Were there third parties who were interviewed who said? There were third parties who were interviewed who did not see the altercation but did see how nasty and rude and obnoxious Mr. Razmi was towards Mr. Pampanga. The idea that they're arguing this belief that there are surveillance cameras in the corridor where the fight broke out is simply wrong. They asked during the discovery period to see the tapes. We responded that there are no tapes because there are no cameras. They could have easily asked for a site inspection. Had they done that, they would have seen what I saw with my own eyes when I walked down that corridor. There are no cameras in the corridor. So the idea that we are hiding evidence that would have exonerated Mr. Razmi is just fiction. But Mr. Solomon, there isn't any question. Is there that there were factual questions here about discriminatory intent or motivation? No, Your Honor. There are no disputed issues of fact because that's not an issue that was ever raised. You're talking about the idea that a jury could fancifully create a thin air, a conspiracy? No, I'm not suggesting fabrication by the jury or fantasies by the jury. I'm just asking whether there aren't factual questions. There are allegations made by the plaintiff regarding these various allegedly insulting statements. The investigation that was done by Marriott vetted those issues. No, I understand that. I have no doubt that Marriott vetted it in complete good faith and that you have acted in complete good faith in saying that there was no discriminatory intent or motivation. But isn't that question ultimately for the jury? Your Honor, we have to go on the record that's before us. And the record before us does not indicate ground sufficient to overturn the dismissal of the hostile work environment claim or the retaliation claim. The comments that were made cannot be looked at in a vacuum. We can't ignore reality. And Judge Nathan bent over backwards to give plaintiffs every possible inference in his favor when she came to her decision. Mr. Solomon, the district judge, as they noted, said it was evidence of pervasive discrimination, right? I understand that. We have to take the plaintiff's version, which is that he was constantly, after he made the complaint, Mr. Bergstein noted he said that they never called him by his real name again, that they continually insulted him using overtly ethnic terms, right? Judge Nathan analyzed the totality of the circumstances. She did observe the name-calling was not because of his national origin or his religion. Why? That's the fundamental question. Why? Let me get the question out. Sure. Forgive me. Why isn't that a jury issue? She made the determination that because he had no problems for years, that this was all attributable to his wage theft allegation. I think she – Why can't a jury conclude that, as I noted, that not only did they want to retaliate him because of that, but they were going to retaliate in a way that used ethnicity and religion to harass him? I think the judge's opinion gives him that benefit of that doubt, because she does assume that the name-calling happened just like plaintiff described. Then she attributes it to the wage theft and not to any type of ethnicity or religion, even though they were overtly tied to that. But she did go beyond it, and she did give him the benefit of that doubt by also recognizing that whatever happened to plaintiff, assuming that plaintiff said it happened exactly the way he said, it did not alter the conditions of his workplace, because the plaintiff offered nothing to suggest that the alleged name-calling caused him any issues at work. Why would he complain three different times in November 2013, May of 2014, January of 2016? Isn't that evidence that it was bothering him? Whether it was bothering him or not doesn't change the standard. That's only one factor. A person who is being harassed based upon an impermissible factor, race, gender, ethnicity, if they're enduring it and performing well, you're not suggesting just because a person is performing well that that means they can't still have a hostile work environment. You're not suggesting that, are you? I think that the judge was correct when she compared the cases cited by plaintiff and the facts as cited by plaintiff that they did not establish hostility because there were no impact to him in the workplace. Feingold is a case that the EEO cites. In that case, plaintiff proved the hostility resulted in something physical and tangible, a denial of proper training, feedback, and instruction. In Rivera, the comments and questions... Does it have to be a physical impact of the hostile work environment? I'm saying that there are examples that we've all cited in our briefs, Feingold, Rivera, WC&M Enterprises, which show what the law is designed to protect. The law is designed to protect if someone upsets them every day to go to work. If they continue to perform the job well and they're promoted or whatever they do, if it's bothering them, that's enough, right? Your Honor, the district court was correct in our view that not every petty slight and insult that makes somebody uncomfortable or unhappy is unlawful. It's not like he was called a Muslim extremist or he was involved in 9-11 or called a member of the Taliban. There was no N-word. There was no physical contact. There was no disruption at all in his workplace. There's no evidence in the record that he missed a second of work, that any part of his job performance declined because of his co-worker's so-called hostility. And that brings me to my last point, which is the strongest support for summary judgment and arguably the one that Judge Nathan, if she made a mistake, she made a mistake by not focusing on the fact that there was no analysis of imputing co-worker harassment to Marriott. The record is clear that the individual defendants were union member banquet waiters, just like plaintiffs. They had no supervisory authority or control. And in that case, under Feingold, this court's standard is that the plaintiff must show he had either no avenue of complaint or that Marriott knew the illegal act and did nothing. Plaintiffs certainly cannot meet the first element to impute liability because it's undisputed. Marriott repeatedly investigated his accusations, both at the hotel property and above the hotel property. The fact that their investigation could corroborate nothing of Mr. Razmi's allegations doesn't mean that he certainly had an avenue of complaint. And as the court understands, he complained quite a bit. And plaintiffs cannot meet the second element of the standard because Marriott took reasonable corrective measures, despite the repeated investigations and the absence of any evidence that any of these co-workers did or said anything wrong or improper. What about in January 2016? He said he drove to Maryland. He spoke with the director of global investigations. He said he was telling him he had been insulted every day and that Mr. Wallace said they should take it to Ms. Hassinger. And then he told me he had done that. He said, I don't know. It's not my department. Isn't that a jury issue of whether or not that was an adequate response? Your Honor, complaining to the wrong person and having him say talk to the right person is not nothing because what we're talking about in the standard, according to Feingold, is that we knew of the illegal act and did absolutely nothing. And the record is clear that we tried as well as we could under the limited, virtually nonexistent evidence that Mr. Razmi completely How did Ms. Hassinger do that? He never complained to Ms. Hassinger. The record is clear on that. The response depends on the gravity of the harm and the response to that harm. What did Marriott do when he complained? Every time he complained to Marriott, Marriott investigated. They talked to everyone. And even though they found no evidence of any wrongdoing, despite the fact that these allegations took place in rooms full of people, they counseled everyone not to do these name callings. Name calling is not to be tolerated. So even though these were petty slights, according to him, the N-word was never raised or anything close to it, there was no physical violence, there was no threatening conduct, there was no job interference, there were no witnesses to the alleged name calling that supported his claims, and the accused co-workers came up with numerous witnesses corroborating that they were innocent. And despite all of that, Marriott still warned the individual defendants that name calling would not be tolerated whether they did it or not. Thank you, Mr. Salk, very much. Thank you, Henry. I gave you a little extra time, and let's hear from Mr. Bergstein, who is reserved two minutes. He did complain to Hassinger, and that's page 381 of the Joint Appendix, at page 404 of his deposition. He complained to five or six different people, and the pattern was they either never got back to me, they told me it's not my job, or keep your mouth shut. That was Doherty. I want to emphasize the context of the keep your mouth shut comment by Doherty. Page 367 of the appendix, deposition pages 307 to 309, makes clear that was in the context of plaintiff's complaints about the hostile work environment as opposed to his complaints about wage theft by the employees. Telling an employee to keep your mouth shut when he's complaining about the hostile environment is probably the last thing you say to somebody who's complaining about a hostile work environment. We heard that the comments did not alter the conditions of the workplace. Harris v. Forklift says you don't need a tangible consequence in order to have a hostile work environment claim, so long as the work environment is abusive. Most hostile work environment claims in this circuit involve repeated name calling as opposed to physical attacks or people getting fired, and they still have issues for the jury. As far as the claim that the comments were not serious, the comments were so vulgar that I wouldn't feel comfortable repeating them in this court. Half of them involve the F word, and the others involve ethnic slurs that would offend anyone with normal sensibilities. Thank you. Thanks, Mr. Coleman. Thanks, Mr. Solomon. Well argued, and we appreciate it very much. We'll hear Delaware River Network, Et al. v. New York State Department, etc., and Millennium Pipeline Company. Mr. Yeager, go ahead. May it please the Court. Thank you, Your Honor. Jordan Yeager of Curtin & Hefner on behalf of the Delaware Riverkeeper Network petitioners. The Clean Water Act, 33 U.S.C. 1342b3, makes it clear that a state permit that would authorize a discharge of pollutants into the waters, that before ruling on such an application, the state must ensure an opportunity for a hearing. That's what this case is about. That opportunity was not provided here. The explanation for why that opportunity was not provided was because this involved a general permit. There is nothing, while certainly the states and the federal government are able to utilize general permits, there's nothing in the Clean Water Act that exempts general permits writ large from the obligations of providing an opportunity for public participation. It may be that there are some general permits where, because of the nature of the activity and the nature of the submittals, where the court can balance and say that the opportunity for hearing has been consumed within the agency's decision to issue the general permit. And the courts are divided on this, but as the Waterkeeper Court and the EDC Court have found, not all general permits are created equal. And there are some general permits for which, to obtain coverage, you need to submit details. And that's exactly the kind of permit regime we have here. The Stormwater Pollution Prevention Plan, the SWPPP, that's at issue here, required extensive details. This was a 400-page submission about not the ultimate effluent limitations. Those are set out in the general permit itself. But they contain details about the how, about how is this applicant, how are they proposing to go about this extensive activity. We're talking about over 150 acres. And it's that detail about the how that makes this case similar. It's a different factual setting than what was considered in the Waterkeeper case and what was considered in the EDC case out of the Ninth Circuit. But what is similar is that it's those details in what's submitted to the agency that makes this an application that allows people to be entitled to public. There's no rejection. Once you submit the application, it's an automatic grant of the permit, right? There is a, by operation of law. There's no determination. So how can something be considered an application if there's no ruling? There's no determination. You get the permit. Well, I think there are two different questions. Is it an application and is it a ruling? Start with application. Well, so the application, I don't believe that what comes after the submittal impacts whether the detailed nature of what you have to submit makes that an application. You're requesting coverage. That's the language of the general permit regime. That request for coverage, to say that's not an application for coverage, I think is a semantic distinction without a difference. Isn't that what the Seventh Circuit said in the independent producer's case? It is. In that case, there was, the EPA was involved and there was, that's the Texas case I believe Your Honor is referring to. The court's analysis there was not as detailed as it was in the Waterkeeper case from this circuit or in the EDC case from the Ninth Circuit. It really went to a Chevron deference very quickly, and because the EPA was there and the EPA had expressed its rationale, it deferred to that rationale. But, yes, there is a split at that level over whether, as a general rule, you must always allow for that, whether you would always treat it as an application. I don't know if there's a split. I think New York, Maryland, and the Seventh Circuit have all come out one way, right? Well, at the state level. In interpreting this issue, in addressing this issue, right? Yes, at the state level. What's the split then? Well, within the circuits, the, you can look at the Waterkeeper case from this circuit and the EDC case from the Ninth Circuit that addressed this question about the public participation under general permit regimes and whether the submittal of an application, and I don't want to put the rabbit in the hat in the words that I'm using, but whether the submittal of the documents for coverage as part of a notice of intent, whether that triggers the public participation requirements. And so you have this circuit and, again, in a slightly different scenario. Let me ask you about mootness because you didn't, they had submitted this letter in September and then they submitted an updated letter. Why isn't this moot if the project is over? So the, it's not moot for two reasons. But the basic standard, when we look at both of the elements of the standard, it's not moot. The first question is, first of all, whether everything, so let me revise that. There's really three answers to that. First, because of the nature of the activity, the restoration of the site is part of what this is all about. It's not simply the activity as the construction is going on, but it's also about were the plans that you submitted sufficient to allow the site to be restored so that going forward in time there isn't an unlawful level of discharge and pollutants into the waters of the United States. And so it's because of that ongoing, the ongoing nature of the activity, because of the nature of the restoration activities, that there's still an opportunity to address what's going on here if we have an opportunity for hearing. Before you go much further, what exactly do you want from us? What's the decreto language that you're asking us to adopt? We are asking for a remand back to the permitting agency for an opportunity for hearing. And we would agree. And what will you do once you get there, if you get there? So then we would have to submit to the agency what the basis for that hearing request is. And as part of that, we would then – I have no idea what you want. We want the ability to submit comments that the agency would actually have to consider over the adequacy of the restoration activity. To do what? And then to do what? So that if, as a result of those comments, to consider those comments, and if, as a result of those comments, it agrees that the restoration activities that are part of the plan are inadequate, to require revisions to that restoration activity. What would that involve, physically? It would involve the submittal of expert reports, and it would involve the opportunity for a hearing. I want to go beyond hearings and lawyers. What is it that you – beyond – what do you as a lawyer for your client wish to achieve? What's the proverbial bottom line? We wish to achieve the – there are two elements. We wish to achieve the ability for the agency to hear the concerns about restoration, and we wish to – the opportunity to – I'm sorry, Your Honor. What do you want to know about the restoration? We want to improve the ability of this restoration activity to protect the waters of the United States. To do what? How? So the – when one looks at the – I assume you don't want to have a hearing ad infinitum. No. That's not what you want. There were numerous best management practices. As a term of art, there were numerous best management practices that were chosen, numerous best management practices that weren't chosen. We could see from the record that the best management practices that were chosen resulted in problems. We want the opportunity for the agency to say, you need to do these other best management practices going forward so that there won't be damage to the waters of the United States. Okay, great. Thanks very much. Can I finish the question? Not really. Okay. You'll get up again. All right. Thank you, Your Honor. May it please the Court, Brian Ginsberg for the New York State Department of Environmental Conservation. This case is moot. There is no further relief that Petitioner could obtain in the present perceiving. Petitioner's demand for relief in his brief was to rescind or remand Millennium's construction coverage under the permit. As the letters that we and Millennium have submitted recently indicate, with the notices of termination, that coverage is gone. That has been relinquished. The coverage that they want Millennium to no longer have, Millennium has forsworn. Any sort of remand or remittal for notice and comment on these restoration measures would be purely an advisory opinion because there's no more construction that has to take place. The issue with respect to the ongoing operation of these restoration measures is an issue of the operation of the elements of the ESU, of Millennium's ESU project, not an issue with respect to construction. The permit in this case involves only construction. And to the extent my friend on the other side paints that as some sort of a collateral consequence, this court has never found such a consequence to keep a case that is otherwise moot, to keep such a case alive outside of the criminal or the immigration enforcement context. I do want to move quickly, though, to the merits in case this court does address them. Again, we think you don't need to. The case is moot. We also have threshold jurisdictional and timeliness arguments. But something my friend on the other side led with was the fact that not all general permits are created equal. Exactly. That's why we win on the merits of this case. The general permit here, Millennium's notices of intent under the general permit here did not delegate so much discretion to the owners and operators that they became the functional equivalent of permit applications under the Clean Water Act. Unlike the permit at issue in the Waterkeeper case that he refers to, this court's earlier decision in Waterkeeper, some of the other circuit cases and the like, the general permit here incorporates specific and quantitative restrictions on construction activity. And I want to flesh that out a little bit because I think it might not have been fully fleshed out in the briefs. The best evidence of those specific, granular, constraining numerical limitations are the two voluminous manuals of standards that the general permit incorporates by reference. The first is the New York Standards and Specifications for Erosion and Sediment Control. That's referenced at JA56. And the second is the New York Stormwater Management Design Manual at JA59. These manuals prescribe a tightly constrained menu from which the means of satisfying the permit's effluent limitations may be achieved. And as to each such menu option, they impose detailed, granular, and in many cases numerical constraints as to how that option must be implemented. And with the time I have, I'll just give one example that I think really illustrates the point and how constraining this general permit is, how it does not delegate the discretion. So one example that's, again, incorporated by reference from these manuals, the owner-operator must minimize sediment discharges. That's one of the effluent limitations set out in the permit. The manuals require that he has to achieve this effluent limitation in one of a handful of prescribed ways, one of which is planting grass for the purpose of catching or slowing the speed of stormwater runoff. And to give you an idea of just how constraining and how little this leaves to owner-operator discretion, the manuals set forth a detailed table delineating what type of grass must be used under which circumstances, when you can use Kentucky fescue grass versus Kentucky bluegrass versus ryegrass, and what the maximum allowable velocity of water through the grass can be, measured down to the half of a foot per second. So my friend's characterization that the permit here and the notices of intent that must be submitted under the permit here leave so much to owner-operator discretion that they fall into the waterkeeper realm is simply fanciful. This is the opposite of that broad delegation. So to the extent this Court is inclined to reach the merits, which again we think there's about three threshold reasons why you shouldn't, but to the extent this Court should reach the merits, we think that also provides an avenue for dismissal. And to require the sort of hearing that my friend on the other side wants with respect to these individual notices of intent, it would completely eviscerate the administrative efficiency that motivated DEC to provide the general permit scheme in the first place. There have been about 1,000 notices of intent per year submitted under this permit, and I heard my friend talk about expert reports and the like to involve that sort of hearing, that sort of public commentary on each individual notice of intent, in addition to the public comment that was provided at the promulgation stage of the general permit, would go against DEC's purpose in enacting the permit and go against Congress' will in allowing the permitting scheme first originated by EPA in the 70s to perpetuate. So with that, we'd ask that the petition be dismissed.  We'll hear from Mr. Morrone. May it please the Court, Sean Murata for Millennium Pipeline Company, LLC. Again, I'll associate myself with the Department's comments that this case is really quite moot. The hook, the thing that they would like remanded or vacated is the extension of coverage under the general permit. But as the notices of termination that we filed and have updated yesterday, there is no more coverage under the general permit. There's nothing left for this Court to vacate or remand. The coverage does not exist anymore. So there's really nothing left for this Court to remand or vacate. And the general permit ends in January, right? It does end in January, and I think it's quite interesting, Your Honor, that the general permit ends. There is a new general permit that has been put out for comment to replace the current general permit, and I'm informed by my friend from the Attorney General's office who's informed by his client that one Delaware Riverkeeper has not commented on that general permit, which if what they really want is this sort of notice and comment situation, that's an excellent avenue to do it. And second, no one in commenting on that general permit. Will they be able to achieve the sort of things that Mr. Jaeger was saying earlier with respect to the next round? Under the new general permit, my understanding is it's a repeat of the current one in the sense there is no offer of public participation. But if Delaware Riverkeeper thinks that is unlawful, they should comment on the new general permit and then challenge the new general permit judicially when it is finally finalized. But you can't do it in this case where, again, there is no more coverage under the general permit to even remand or vacate. And I think there's an additional problem with mootness because, you know, what revisions to the plan would be made if there was a remand or a vacater? He says, well, we want to give comments. And then when you press and say, what would those comments say? They didn't really have an answer. Finally, at the end, you were told there were certain best management practices that could be implemented. But there is no suggestion that those best management practices that they want to use have anything to do with anything that's left that Millennium could do. Because remember- Suggestion now comes down to restoration, right? Isn't that really what they're arguing? Well, restoration is complete. And there isn't a suggestion that the best management practices they want implemented have anything to do with restoration. In other words, that one of the best management practices they would want implemented, which, again, they have talked about very generally, has anything to do with restoration or something about Millennium's restoration that was inadequate. And the mere- So restoration is complete. And if they don't like it, they know why they don't like it as we sit here today. Or they should know why they don't like it. They should, but I don't know if they do know why they don't like it. I mean, there was pressing to ask, say, what do you want them to do differently on the facts right now? And you didn't really get an answer. It was best management practices. Well, best management practices said in many different ways. Some that relates, I think, to the construction. But nothing, at least that I'm aware of, that has been either said from the podium or said in the papers that relates to the restoration. So, one, there's nothing left for the score to vacate or remand. And second, even if there were, it's not clear what they want Millennium to do. And a bare procedural right is not sufficient. I want to touch on the timeliness issue that hasn't been brought up to this point because it's quite shocking that Delaware Riverkeeper thinks that either there is no time limit for them to bring their challenge or it's a four-year time limitation for them to bring their challenge, which is really quite shocking for a statute that was meant to speed up challenges to extensions of coverage or any sort of challenge as to a FERC jurisdictional facility like this one. As we point out in our brief, Section 717RD of the Natural Gas Act does not create a cause of action and therefore does not fall within Section 1658A's four-year statute of limitations. It does not create a cause of action because it provides that the court shall have original and exclusive jurisdiction over any civil action. When statutes speak of jurisdiction over any civil action, that is the quintessential language for a statute that does not create a cause of action. Rather, it simply tells you where you bring your pre-existing cause of action. The cause of action in this case is created under New York state law and it's created under New York state law because the Clean Water Act requires there to be a cause of action under New York state law if they're going to engage in state-level permitting. So the notion that Delaware Riverkeeper today says, well, it's four years when it would not be four years if this were brought under state law and would not be four years if it were even brought under federal law is simply incorrect and the court, to the extent it does not dismiss on threshold mootness grounds, should make clear that it's not a four-year statute of limitations. And it's completely inconsistent with the purpose of Section 717D, which was to speed up these types of decisions. Finally, turning briefly to the merits, I think in addition to everything that my friend from the Department said, I want to emphasize one way in which this case is different than the Waterkeeper Alliance case from this circuit and the Environmental Defense Center case from the Ninth Circuit, which is simply that in those cases you were challenging either a regulation that authorized general permit or a general permit itself. But here, on page 12 of their opening brief, Delaware Riverkeeper says we are not attacking the general permit because of course they're not because that would be untimely. They say we're not attacking the general permit. We're just attacking the extension of coverage under the general permit. And that actually places this case much more like the Natural Resource Defense Council case from the New York Court of Appeals, where the New York Court of Appeals says, you know what, we're going to take the lay of the land as we find it. We're going to accept the EPA regulations. And what we're going to say is, well, under those EPA regulations, is this general permit in that case, and here even the extension of coverage consistent with it? And the answer is yes. And it would be quite, I think, incongruous for this court to disagree on the merits because what you would then have is that for FERC jurisdictional facilities in New York, there would have to be notice and comment. But for non-FERC jurisdictional facilities under that New York Court of Appeals case, there wouldn't be notice and comment. And that would be a difficult split indeed, unless the court has permission. Thank you, Mr. Marano, very much. Mr. Yeager? Thank you, Your Honor. I want to go back to Your Honor's question on mootness because the other two elements are the duration of the challenge activity and whether there's a reasonable expectation that plaintiffs will be subject to a challenge action again. This is a case where my predecessor in the case sought a stay of the action so that the activity wouldn't go forward. That stay was denied, so here we are. And what we're stuck with is a situation where we're going to see a continued This is not just a clean water action case. It's also a case under the Natural Gas Act. And one can't think about, hear the arguments without saying, not only don't we get an opportunity to be heard when the coverage is granted, because in addition to the automatic coverage that operates by operation of law, there's also then a completion statement that's issued by the department to say we consider it to be complete. We've looked at the details of the BMPs and consider them to be adequate. But you don't even get into court. This took over two years. I mean, what makes you think that if there were another general permit granted that your client objected to, that you couldn't bring another action to challenge it? Matter of fact, it seems like your client waited eight months after Millennium received the general permit to even bring this petition, and then there were some delays in the briefing. So I don't understand why you think if another general permit were issued, you wouldn't be able to litigate that. I just want to clarify the difference between the issuance of the general permit and the coverage action for this site-specific activity. Just to be clear in my language, I just want to make myself clear. I believe it was July of 2017 that the agencies on the final notice of intent issued its completeness. The action was then filed in late fall of 2017. So I don't know that it's as long as eight months. There's no question that it's beyond the 30 days. While my colleagues find it shocking that we're arguing that this is timely, the Third Circuit and the Fourth Circuit have both looked at this parallel situation. The Fourth Circuit in the Sierra Club case, the Third Circuit in the 2017 Delaware Riverkeeper Network case both looked at these. The Third Circuit one is the 870F3-171. The Fourth Circuit is the 899F3-260. Both looked at these parallel set of issues and said that the four-year catchall of 1658A applies and noted that Congress specifically enacted that section to alleviate uncertainty inherent in the practice of borrowing state statute of limitations. The other thing to keep in mind is because this is a National Gas Act case, this is a record review case. So we didn't have the ability under the Natural Gas Act, under the Administrative Procedures Act, to bring to you those details on the substance. This court is limited. Thank you, Your Honor. We'll turn to the last case on our calendar. The Krista McAuliffe Intermediate Schools et al. v. Bill de Blasio. Yes, sir. Go ahead, Mr. Kizer. Good morning, Your Honors, and may it please the Court. My name is Chris Kizer, and I represent the appellants, Krista McAuliffe Intermediate School PTO, Chinese American Citizens Alliance of Greater New York, and the Asian American Coalition for Education. This case is about New York City's effort to inject racial consideration into the admissions policy at its renowned specialized high schools. One of the many virtues of schools like Stuyvesant, Bronx Science, and Brooklyn Tech is their objective admissions policy. These schools care about your SHSET score. They don't care about your race or who your parents are. About half of these schools, the students at these schools, come from low-income families, and even more of those are Asian Americans. However, the mayor and the chancellor are unhappy with the racial balance at the specialized high schools and seek to make the school's demographics mirror those of the city as a whole. That means an ultimate goal of fewer Asian American students, even though most of those students, like those at Krista McAuliffe Intermediate School, come from low-income families, and many are the children of immigrants. The mayor and the chancellor sought to change the admissions exam requirement, but since that is enshrined in state law, they used their power over the city schools to alter the eligibility requirements for the Discovery Program. Discovery is designed to give a second chance for admission for low-income students who scored just below the cutoff, but in recent years before this current expansion, it was quite small, and schools with high cutoffs, such as Stuyvesant and Bronx Science, did not participate at all. As a means to accomplish these racial goals, the mayor and the chancellor required each specialized school to set aside 20% of their seats in each incoming class for Discovery students. Was it just racial, or wasn't it also geographic? So one of the concerns was, you know, people from these locations weren't going to those schools. There was an inadequate representation of the whole city in the schools itself on a geographic basis. Certainly, Your Honor, Mayor de Blasio has expressed concern that the city as a whole is not being represented. However, under Arlington Heights, so long as racial motivation is a motivating factor, and here the record is clear that the mayor and the chancellor considered race predominantly, or at least one of their major considerations. Let me ask you this. I mean, the new Discovery Program, race is not criteria for the program. You can see that, right? Yes, Your Honor. There's no factor of race in terms of the students themselves, correct? Yes, Your Honor. All right. So the question is, and this goes to the likelihood of success on the merits, is there any Supreme Court case, case from this court, or even broaden it to any circuit court,